UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT
FEB 24 2017
RECEIVED

FILED FEB 24 2017
CLERK
UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

# UNITED STATES COURT OF APPEALS
## DISTRICT OF COLUMBIA CIRCUIT

333 Constitution Avenue, NW
Washington, DC 20001-2866
Phone: 202-216-7000 | Facsimile: 202-219-8530

Case Caption: T-MOBILE USA, INC.

Petitioner

v.

Case Number: 17-1065

NATIONAL LABOR RELATIONS BOARD

Respondent

## PETITION FOR REVIEW OF AN AGENCY, BOARD, COMMISSION, OR OFFICER

Notice is hereby given this the 24th day of February 2017 that petitioner T-Mobile USA, Inc. hereby petitions the United States Court of Appeals for the District of Columbia Circuit for review of the Decision and Order of the respondent National Labor Relations Board in Cases 01-CA-123183, 01-CA-129976, 01-CA-140752, reported at 365 NLRB No. 23 and entered the 2nd day of February 2017.

Attorney for Petitioner,
T-Mobile USA, Inc.

/s/ Mark Theodore
Mark Theodore (*admission pending*)
Irina Constantin (*admission pending*)
Address: Proskauer Rose LLP
2049 Century Park East, 32nd Floor
Los Angeles, CA 90067-3206

Telephone: (310) 557-2900

NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.

**T-Mobile USA, Inc. *and* Communication Workers of America, AFL-CIO *and* Communication Workers of America, Local 1298, AFL-CIO.** Cases 01–CA–123183, 01–CA–129976, and 01–CA–140752

February 2, 2017

DECISION AND ORDER

BY ACTING CHAIRMAN MISCIMARRA AND MEMBERS PEARCE AND MCFERRAN

On August 3, 2015, Administrative Law Judge Raymond P. Green issued the attached decision. The General Counsel filed exceptions and a supporting brief, and the Respondent filed an answering brief.

The National Labor Relations Board has considered the decision and the record in light of the exceptions and briefs and has decided to affirm the judge's rulings, findings,[1] and conclusions in part and reverse them in part.

We adopt the judge's dismissal of the allegations that the Respondent violated Section 8(a)(5) and (1) of the Act by issuing and maintaining its employee handbook, which included "at will" and "attendance" policies, in January 2014.[2] Additionally, we adopt the judge's dismissal of the allegations that the Respondent independently violated Section 8(a)(1) of the Act by this same conduct.

For the reasons discussed below, we reverse the judge's dismissal of the allegations that the Respondent violated Section 8(a)(5) and (1) by refusing to bargain with the Union over a successor collective-bargaining agreement.

### A. Facts

The Respondent is a cell phone service provider that employs workers throughout the United States. Pursuant to an election held in 2011, the Respondent recognized the Communications Workers of America and its affiliated Local 1298 (collectively, the Union) as the exclusive collective-bargaining representative for a unit consisting of "[a]ll full-time and regular part-time field technicians, switch technicians and material handlers employed by T-Mobile USA in the State of Connecticut, but excluding all other employees, contractors and supervisors and guards as defined in the Act." The Respondent and the Union entered into a collective-bargaining agreement, effective from July 31, 2012, through May 31, 2014.

On March 28, 2014, a unit employee filed a decertification petition, supported by a showing of interest. The petition remains pending, although it has been blocked by the unfair labor charges at issue in this case. Shortly thereafter, the Respondent received a separate petition signed by 13 of the 20 bargaining unit employees, stating that they no longer wished to be represented by the Union. In April 2014, the Respondent and the Union began to discuss negotiating a successor agreement, and scheduled bargaining sessions for June and August. The Union cancelled the bargaining sessions in June, but attended two sessions in August.

On October 8, 2014, the Respondent notified the Union that it was suspending bargaining over a successor contract until the representation issue was resolved, but would continue to recognize the Union as the bargaining representative for the unit employees, abide by the terms of the expired collective-bargaining agreement, and bargain on interim matters. The Respondent has indeed continued to negotiate with the Union over interim matters, including stock grants, changes to the fleet policy, and changes to the mileage reporting and tax implications for use of company vehicles. The Respondent has also processed a termination grievance, continued to furnish information upon the Union's request, and continued to speak with the Union about matters affecting unit employees. The Respondent has continually refused, however, to bargain over a successor collective-bargaining agreement.

### B. Discussion

The judge found that the Respondent did not violate Section 8(a)(5) and (1) of the Act by suspending negotiations over the successor collective-bargaining agreement in October 2014. Citing *Levitz Furniture Company of the Pacific*, 333 NLRB 717 (2001), the judge observed

---

[1] In the absence of exceptions, we adopt the judge's dismissal of the allegations that the Respondent violated the Act with regard to a change in notice requirements for use of paid time off.

[2] The judge erroneously found that the General Counsel abandoned the complaint allegations relating to the Respondent's "absenteeism" policy. To the contrary, both the General Counsel and the Charging Party addressed the "absenteeism" policy in their briefs to the judge, although consistent with the complaint allegation, they referred to it as the "attendance policy." Therefore, we find that this allegation was not abandoned. Nevertheless, we agree with the judge's conclusion that the Respondent did not violate the Act with respect to its issuance of the 2014 handbook, for the reasons stated in his decision.

Member McFerran finds that this case is distinguishable from *Heck's Inc.*, 293 NLRB 1111 (1989) (finding a violation of Sec. 8(a)(5) and (1) where the employer distributed an employee handbook inconsistent with the terms of the collective-bargaining agreement), and *United Cerebral Palsy of New York City*, 347 NLRB 603 (2006) (same), cited by the General Counsel, because the collective-bargaining agreement here contained a superseding clause that could be reasonably read to state that the agreement would govern over inconsistent work rules and policies.

that an employer may unilaterally withdraw recognition from an incumbent union if it has objective evidence that the union has lost majority support. See *Levitz*, supra, at 725. The judge acknowledged that while an employer's otherwise legal withdrawal of recognition can be "tainted" by unfair labor practices, see *Lexus of Concord, Inc.*, 343 NLRB 851, 854 (2004), he had not found any unfair labor practices in this case. Pointing to the decertification petition and the separate petition signed by the Respondent's employees, the judge concluded that the Respondent had presented sufficient evidence of the Union's loss of majority support to entitle the Respondent to withdraw recognition from the Union completely. Therefore, the judge found, and our dissenting colleague agrees, that the Respondent was equally entitled to take the "lesser path" of suspending negotiations over the successor collective-bargaining agreement on a temporary basis.

We disagree. In *Levitz*, the Board held that an employer may unilaterally withdraw recognition from an incumbent union if the union has actually lost the support of the majority of the bargaining unit employees. Id. at 723. When the employer withdraws recognition, it does so at its own peril, and will be required to show actual loss of majority support if the union files an unfair labor practice charge over the withdrawal. Id. at 725. Alternatively, an employer that has evidence of actual loss of majority support may decide not to withdraw recognition, but rather to seek an RM election to determine whether or not the union still enjoys majority support. Id. at 724, 726. The employer remains obligated to continue bargaining with the union while the RM petition is processed. *Levitz*, supra, at 726–727.

*Levitz* does not specifically address whether an employer that continues to recognize the union may nevertheless unilaterally refuse to bargain over a successor contract. However, the Board held in *Levitz* that if an employer chooses to continue to recognize the union and file an RM petition, rather than withdraw recognition, the employer is obligated to continue to bargain. Id. Here, the Respondent continued to recognize the Union, but unilaterally chose which parts of the bargaining relationship it would honor, thereby refusing to fulfill all of its normal bargaining obligations. We cannot countenance this selective approach to a collective-bargaining relationship. Instead, we find that so long as the Respondent continued to recognize the Union, it was obligated to fulfill all aspects of its bargaining obligations.[3] Its refusal to bargain over the successor contract therefore violated Section 8(a)(5) and (1) of the Act.

When an employer has a duty to bargain, it has a duty to fulfill all of its mandatory bargaining obligations. An employer that fails to do so destabilizes the bargaining process in two important aspects. First, an employer that unilaterally removes certain bargaining subjects from negotiation can gain an advantage by excluding those subjects on which it may be more likely to give concessions to the union, reducing the likelihood that the parties will find common ground. Similarly, permitting an employer to unilaterally choose which parts of the collective-bargaining relationship to honor would allow the employer to continue to recognize and bargain with the incumbent union only in those areas where the employer holds an advantage, whether legal or economic, thus reducing the possibility of compromise and the ability of the relationship to function effectively. Cf. *Endo Laboratories, Inc.*, 239 NLRB 1074, 1075 (1978) (recognizing "the kind of 'horsetrading' or 'give-and-take' that characterizes good-faith bargaining"). And that unbalanced playing field could persist in the event the employer neither withdraws recognition nor files an RM petition. Second, and relatedly, allowing an employer to unilaterally dictate which subjects the parties can bargain undermines the union, making it appear ineffective and weak to the employees. Thus, permitting bargaining only in those areas that the employer chooses would deny the union a fair opportunity to demonstrate its continued effectiveness, a matter of particular concern if the employer eventually does file an RM petition. These effects are wholly inconsistent with the Act's policy to foster stable collective bargaining relationships.

The Board's decision in *Lexus of Concord, Inc.*, supra, does not, as the Respondent and our dissenting colleague contend, require a different result. In *Lexus*, an employer briefly suspended all bargaining with an incumbent union after receiving a letter from a majority of union employees stating that they did not want to be represented by the union. Id. at 851. The Board examined this conduct in assessing whether it "tainted" a later decertification petition, finding that under the specific circumstances a brief suspension of all bargaining was a reasonable response that did not amount to an unlawful refusal to

---

[3] Our dissenting colleague asserts that our decision forces upon employers the "Hobson's Choice" of either negotiating with a non-majority union, and therefore taking actions inconsistent with Secs. 8(a)(2) and 9(a) of the Act, or withdrawing recognition completely and facing protracted litigation under the Levitz standard. However, the Board noted in Levitz that "even an employer that has evidence of actual loss of majority support will not violate Sec. 8(a)(2) if it files an RM petition and continues to recognize the union while election proceedings are ongoing." Supra, at 724, 726 fn. 52. Accordingly, requiring an employer to honor all of its bargaining obligations while waiting for the results of an election, even in the case of objective evidence that the union has lost majority support, does not require employers to risk violating the Act.

bargain. Id. at 853–854. The Board emphasized that the employer suspended bargaining during an approximately one-month period in which it had to deal with a letter from employees asking it to suspend negotiations with the union, a refusal-to-bargain charge, the Board's issuance of the *Levitz* decision, and a decertification petition. The Board found the Respondent's conduct reasonable given its "clear need to understand the situation." Id. In contrast, the Respondent here has indefinitely suspended bargaining over one matter of its choosing, rather than a temporary hold on all bargaining.

Finally, we emphasize that nothing in our decision precludes an employer from withdrawing recognition when it has objective evidence that the union has indeed lost majority support; nor does our decision preclude an employer from seeking an RM election when it has good-faith uncertainty as to the union's majority status. What an employer may not do is continue to recognize the union while failing to honor all of its bargaining obligations.[4]

For all of the above reasons, we reverse the judge and find that the Respondent violated Section 8(a)(5) and (1) by failing and refusing to bargain with the Union over the successor collective-bargaining agreement.

ORDER

The National Labor Relations Board orders that Respondent, T-Mobile USA, Inc., Bloomfield, Connecticut, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Failing and refusing to bargain over a successor collective-bargaining agreement with the Communications Workers of America and its affiliated Local 1298 (the Union) as the exclusive collective-bargaining representative of employees in the bargaining unit.

(b) In any like or related manner interfering with, restraining, or coercing its employees in the exercise of the rights guaranteed to them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Unless and until the Union is decertified or the Respondent lawfully withdraws recognition, bargain with the Union as the exclusive collective-bargaining representative of the employees in the following appropriate unit concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement:

> All full-time and regular part-time field technicians, switch technicians and material handlers employed by T-Mobile USA in the State of Connecticut, but excluding all other employees, contractors and supervisors and guards as defined in the Act.

(b) Within 14 days after service by the Region, post at its facility in Bloomfield, Connecticut, copies of the attached notice marked "Appendix."[5] Copies of the notice, on forms provided by the Regional Director for Region 1, after being signed by Respondent's authorized representative, shall be posted by Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, the notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by Respondent to ensure that the notices are not altered, defaced, or covered by any other material. If Respondent has gone out of business or closed the facility involved in these proceedings, Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by Respondent at any time since October 8, 2014.

(c) Within 21 days after service by the Region, file with the Regional Director for Region 1 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that Respondent has taken to comply.

Dated, Washington, D.C. February 2, 2017

---

Philip A. Miscimarra,          Acting Chairman

---

[4] The result here is consistent with the Board's longstanding policy disfavoring the practice of "piecemeal bargaining" during contract negotiations. As the Supreme Court has acknowledged, "it is difficult to bargain, if, during negotiations, an employer is free to alter the very terms and conditions that are the subject of negotiations." *Litton Financial Printing Division v. NLRB*, 501 U.S. 190, 198 (1991). Although the context of the present case is different—the Respondent refused to bargain over a successor contract at all, while in "piecemeal bargaining" cases the employer engages in bargaining but implements a proposal on a single issue before reaching overall impasse or agreement—the underlying policy concerns are similar: allowing employers to cherry-pick the subjects of bargaining gives them an unfair advantage in negotiations and destabilizes the bargaining process.

[5] If this Order is enforced by a judgment of a United States court of appeals, the words in the notices reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

| Mark Gaston Pearce, | Member |
|---|---|

| Lauren McFerran, | Member |
|---|---|

(SEAL)    NATIONAL LABOR RELATIONS BOARD

ACTING CHAIRMAN MISCIMARRA, concurring in part and dissenting in part.

I agree with my colleagues that the Respondent did not violate Section 8(a)(5) and (1) of the National Labor Relations Act (NLRA or Act) by unilaterally changing its employee handbook in 2014.[1] Unlike my colleagues, however, I would affirm the judge's dismissal of the allegation that the Respondent violated Section 8(a)(5) and (1) of the Act by suspending negotiations over a successor collective-bargaining agreement in October 2014. I would therefore adopt the judge's dismissal of the complaint in its entirety.

The facts of this case, which are not in dispute, are as follows. The Respondent and the Union were party to a collective-bargaining agreement effective July 31, 2012, through May 31, 2014 (the CBA). On March 28, 2014, an employee in the bargaining unit filed a decertification petition supported by a showing of interest, meaning that at least 30 percent of employees in the unit no longer wanted the Union to represent them.[2] Thereafter, the Respondent received a petition signed by 13 of the 20 employees in the bargaining unit stating that the signatory employees did not want to be represented by the Union. Leading up to and for several months following the CBA's expiration, the Respondent met and bargained with the Union for a successor contract. On October 8, 2014, however, the Respondent notified the Union in writing that it was suspending negotiations for a new CBA until an election could be conducted to determine the Union's majority status. The Respondent told the Union that it would abide by the terms of the expired CBA "as well as any other interim bargaining obligations that may arise." Thus, as my colleagues acknowledge, the Respondent continued to negotiate with the Union over a variety of matters, including stock grants, changes to certain policies, and changes to reporting mileage when using company vehicles. The Respondent also processed a discharge grievance, furnished information at the Union's request, and made itself available to speak with the Union about matters affecting unit employees.

On these facts, my colleagues hold that the Respondent violated Section 8(a)(5) when it suspended bargaining for a successor CBA. I disagree. Unquestionably, the Respondent was confronted with a bona fide question regarding the Union's lack of majority support among unit employees. Indeed, the evidence available to the Respondent would have permitted the Respondent to *withdraw recognition entirely*. See *Levitz Furniture Company of the Pacific*.[3] This makes it unreasonable for the Board to conclude that the Respondent violated the Act by suspending one aspect of the bargaining relationship—negotiations for a successor collective-bargaining agreement. As the judge correctly observed: "If the employer could have legally withdrawn recognition, then . . . it could have taken the lesser path of suspending negotiations on a temporary basis."

This "lesser path," which the Respondent took, is further supported by the Board's decision in *Lexus of Concord, Inc.*,[4] in which the Board found that the employer acted reasonably and lawfully by temporarily suspending bargaining entirely for a 1-month period after receiving a letter signed by a majority of its unit employees indicating that they no longer wanted the union to represent them.

In the instant case, the Respondent took an even more restrained approach than what the employer did in *Lexus*

---

[1] One of the handbook provisions at issue in the 2014 handbook stated that employment with the Respondent is "at will," and the other set forth an "attendance / absenteeism" policy. These provisions were the same as the "at will" and attendance provisions in the two prior iterations of the handbook, which issued in 2013 and 2012, respectively. In other words, the Respondent did not change those provisions in 2014, and therefore it did not violate Sec. 8(a)(5). See *NLRB v. Katz*, 369 U.S. 736 (1962) (holding that an employer's unilateral change in terms and conditions of employment violates Sec. 8(a)(5)).

[2] Under the Board's contract-bar doctrine, collective-bargaining agreements of definite duration "for terms up to 3 years will bar an election for their entire period." *General Cable Corp.*, 139 NLRB 1123, 1125 (1962). However, during the term of a bar-quality contract—i.e., a contract that satisfies certain basic requirements set forth in *Appalachian Shale Products Co.*, 121 NLRB 1160 (1958)—the Board will process a petition filed during the 30-day period beginning 90 days and ending 60 days before the date the contract expires or its third anniversary date, whichever is sooner. See *General Cable*, 139 NLRB at 1128 fn. 16. The decertification petition filed on March 28, 2014, was filed during the 30-day open period prior to the contract's expiration. However, the petition has not been processed because the Region has held it in abeyance pursuant to the Board's blocking-charge policy. For reasons expressed in the dissenting views to the Board's representation-election rule, 79 Fed. Reg. 74308 at 74430-74460 (Dec. 15, 2014) (dissenting views of Members Miscimarra and Johnson), I believe the Board should reconsider its blocking-charge policy, but I acknowledge that the Board has declined to materially change this policy, and no party has asked us to do so in this proceeding.

[3] 333 NLRB 717 (2001). I do not here reach or pass on the merits of the "actual loss of majority support" standard the Board adopted in Levitz.

[4] 343 NLRB 851, 853–854 (2004).

of *Concord*. Here, after receiving objective proof that the Union had lost majority support, the Respondent notified the Union that it would continue to recognize and bargain over all mandatory subjects, but until an election could be conducted—as noted above, the pending election petition was blocked—it would suspend bargaining with the Union for a successor CBA.

My colleagues' characterization of the Respondent's conduct defies common sense. According to the majority, the Respondent adopted a "selective approach to a collective-bargaining relationship" that, in their view, is sure to "destabilize[] the bargaining process." This contention fails to recognize that the Union's representative status was rendered doubtful—and was quite possibly negated—by what occurred here: the Respondent's receipt of "objective evidence that the [U]nion had lost majority support."[5] There is no resemblance between the Respondent's extremely restrained, principled actions in the instant case and what my colleagues attempt to portray as an arbitrary picking-and-choosing among different obligations imposed by our statute.

In short, the Respondent's actions—limited to holding in abeyance the negotiation of a successor contract when the available evidence indicated that the Union no longer had majority employee support—otherwise left the bargaining relationship intact. The Respondent continued to bargain regarding a range of mandatory bargaining subjects, it preserved the status quo during the hiatus between contracts, and it minimized any perception that the Union was weak or impotent.

Ironically, the Respondent's actions advanced the goal of promoting stability in labor relations, which is a responsibility placed on the Board.[6] Conversely, my colleagues here effectively find that the Respondent's only lawful options were a Hobson's choice between (i) negotiating a new collective-bargaining agreement covering employees who no longer wanted the Union to represent them, which would be inconsistent with Section 8(a)(2) and 9(a) of the Act, or (ii) completely withdrawing recognition from the Union, which would produce much more significant changes and would likely be subject to protracted litigation under the *Levitz* standard.[7] In any event, the Respondent's actions here were consistent with—and my colleagues' decision is contrary to—the Board's statement in *Levitz* that "Board-conducted elections are the preferred way to resolve questions regarding employees' support for unions."[8]

For the foregoing reasons, I would find that the Respondent acted lawfully by suspending negotiations with the Union over a successor CBA. Accordingly, as to this aspect of the majority's decision, I respectfully dissent.

Dated, Washington, D.C. February 2, 2017

---

Philip A. Miscimarra,         Acting Chairman

NATIONAL LABOR RELATIONS BOARD

APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

---

[5] *Levitz*, 333 NLRB at 725. No party has challenged the sufficiency of the Respondent's objective evidence of lost majority support, nor did any party file exceptions to the judge's finding that the Respondent had such objective evidence.

[6] *Colgate-Palmolive-Peet Co. v. NLRB*, 338 U.S. 355, 362–363 (1949) ("To achieve stability of labor relations was the primary objective of Congress in enacting the National Labor Relations Act.") (citations omitted); *NLRB v. Appleton Elec. Co.*, 296 F.2d 202, 206 (7th Cir. 1961) (A "basic policy of the Act [is] to achieve stability of labor relations.") (citation omitted).

[7] My colleagues disagree that their decision presents the Respondent with a Hobson's choice between two contradictory options (i.e., negotiating a new collective-bargaining agreement with a union that potentially lacks majority employee support, on the one hand, and completely withdrawing recognition pending an election in which the Union may, in fact, establish renewed majority support). Here, my colleagues rely on the statement by the Board in *Levitz* that "an employer that has evidence of actual loss of majority support will not violate Section 8(a)(2) if it files an RM petition and continues to recognize the union while election proceedings are ongoing." 333 NLRB at 724. As noted previously, I do not pass on the merits of *Levitz*. Furthermore, this statement from Levitz does not alter the fact that the employer's interim negotiation of a collective-bargaining agreement may, in fact, be with a union that lacks majority support, which would be inconsistent with Sec. 8(a)(2) and Sec. 9(a), notwithstanding the Levitz statement quoted above. Moreover, it bears emphasis that my colleagues find that the Respondent here violated the Act even though it did continue to recognize the Union. The Respondent merely suspended negotiations for a successor contract pending the outcome of the election. Under existing law, if the continuation of negotiations culminated in a new collective-bargaining agreement, this would have barred any election or other challenge to the Union's majority status for up to three more years, *General Cable Corp.*, supra, even if the Union no longer enjoyed majority support. For the reasons stated above, I believe the Respondent's actions were consistent with our statute, and—in contrast with the actions required by my colleagues' decision today—Respondent's conduct was much more aligned with the Board's responsibility to safeguard employee free choice and foster labor relations stability.

[8] *Levitz*, 333 NLRB at 723.

6      DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

FEDERAL LAW GIVES YOU THE RIGHT TO

 Form, join, or assist a union
 Choose representatives to bargain with us on your behalf
 Act together with other employees for your benefit and protection
 Choose not to engage in any of these protected activities.

WE WILL NOT fail and refuse to bargain with the Communications Workers of America and its affiliated Local 1298 (the Union) as the exclusive collective-bargaining representative of our employees in the bargaining unit.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL, unless the Union is decertified or we lawfully withdraw recognition, bargain with the Union as the exclusive collective-bargaining representative of our employees in the following appropriate unit concerning terms and conditions of employment; and if an understanding is reached, embody the understanding in a signed agreement:

> All full-time and regular part-time field technicians, switch technicians and material handlers employed by T-Mobile USA in the State of Connecticut, but excluding all other employees, contractors and supervisors and guards as defined in the Act.

T-MOBILE USA, INC.

The Board's decision can be found at www.nlrb.gov/case/01-CA-123183 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.



*Rick Concepcion Esq.*, for the General Counsel.
*Mark Theodore, Esq.* and *Irina Constantin, Esq.*, for the Respondent.
*Thomas W. Meiklejohn Esq.* and *Nicole M. Rothgeb Esq.*, for the Charging Party.

DECISION

STATEMENT OF THE CASE

RAYMOND P. GREEN, Administrative Law Judge. I heard this case in Hartford, Connecticut, on May 8, 2015. The charges and amended charges were filed on February 25, March 14, April 29, June 3, and October 29, 2014. Based on those charges, Region 1 of the National Labor Relations Board issued a consolidated complaint on October 31, 2014. This alleged as follows:

1. That since August 2, 2011, the Respondent has recognized the Communications Workers of America (the National Union) and Local 1298 as the representatives of certain employees in Connecticut.

2. That the most recent collective-bargaining agreement was effective from July 31, 2012, through May 31, 2014.

3. That since January 16, 2014, and prior to the contract's expiration, the Respondent issued an employee handbook applicable to the bargaining unit employees that states:

> (a) Employment at TMUS is "at will" which means that it is not for any specific duration and that tan employee or the Company may terminate the employment relationship at any time, for any reason, with our without notice. No one except the President or Chief Executive Officer of TMUS has the authority to change any employee's at will employment status, to make any agreement that an employee will be employed by TMUS for any set period of time, or to make any other promises or commitments that are contrary to this policy of at will employment. For any such agreement, promise or commitment to be binding on the Company, and to be valid and enforceable against it, that agreement, promise of commitment must be part of a written contract signed by an employee and the President or Chief Executive Officer of TMUS and, if applicable, have the approval of the Compensation Committee…

4. That since January 16, 2014, the Respondent, by issuing and maintaining the at-will policy described above, informed bargaining unit employees that the selection of a bargaining representative was futile.

5. That since January 16, 2014, the Respondent, by maintaining the "at will" policy has failed to continue in effect the terms of the expired contract.[1]

6. That since May 29, 2014, the Respondent has unilaterally changed the notice requirements for the use of paid time off, thereby modifying article XVIII of the agreement.

7. That the foregoing changes were made during the term of the collective-bargaining agreement and were made without the consent of the Union, it therefore is contended that the Respondent violated Section 8(d) and 8(a)(5) of the Act.

---

[1] The complaint asserted that the revised handbook provisions also modified the company's policy regarding absenteeism in that they provided that an employee may be deemed to have abandoned his employment if absent for 3 or more days without notice. However, this contention is not mentioned in either the General Counsel's or the Charging Party's Brief. I therefore deem that this allegation has been abandoned.

8. That since October 8, 2014, the Respondent has refused to meet with the Union to negotiate a successor collective-bargaining agreement.

Among other things, the Respondent asserts that it did not modify the collective-bargaining agreement and that its notice to 40,000 nonunit employees regarding their status as "at will" employees, cannot be construed as changing the status of the employees covered by the union contract. The Respondent also asserts that it has not withdrawn recognition and has continued to notify and offer to bargain with the Union regarding any changes in working conditions. Its position is that it has merely suspended bargaining until a question of representation is resolved via an election.

On the entire record, including my observation of the demeanor of the witnesses, and after considering the briefs filed, I make the following

FINDINGS AND CONCLUSIONS

I. JURISDICTION

It is admitted and I find that the Respondent is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act. I also find that the Unions are labor organizations within the meaning of Section 2(5) of the Act.

II. THE ALLEGED UNFAIR LABOR PRACTICES

The Respondent is a phone service provider that employs about 40,000 employees throughout the United States. Most of these employees are not represented by any labor organization.

Pursuant to an election held in 2011, the Respondent recognized the CWA and its affiliated Local 1298 as the exclusive collective-bargaining representative in a unit consisting of:

> All full-time and regular part-time field technicians switch technicians and material handlers employed by T-Mobile USA in the State of Connecticut, but excluding all other employees, contractors and supervisors and guards as defined in the Act.

For the calendar year 2014, there were 20 bargaining unit employees, including about six former employees of MetroPCS who were added to the bargaining unit in December 2013.

The parties stipulated that David Karpinski held the position of Market Manager, Connecticut, for T-Mobile's Engineering and Operations in the State of Connecticut. They also stipulated that in that capacity, Karpinski has been a supervisor within the meaning of Section 2(11) of the Act and an agent within 2(13) of the Act.

It also was stipulated that Christopher Cozza and Christopher Cocola have been union stewards for Local 1298 and have been designated as contact persons for bargaining unit employees by the local union.

The Board certified the union on August 2, 2011. Bargaining commenced in the fall of 2011, and concluded in the summer of 2012. A collective-bargaining agreement was reached in July 2012, and that contract ran from July 31, 2012, through May 31, 2014. This contract was executed by William Henderson and Paul Bouchard on behalf of the Unions and by Mark Appel, who is the Respondent's area director.[2] A number of provisions of that contract are relevant to the issues in this case.

The contract contains a broad management rights clause, which among other things, states that management has the right "to suspend, discipline, discharge, demote or take any other disciplinary action for just cause." The management rights clause also states: "The foregoing management rights are expressly reserved to be decided by the company on a unilateral basis and shall not be subject to any dispute resolution procedure."

At article XVIII there is a clause that provides that employees are eligible to participate in various company benefits, including paid time off. It also states that: "During the term of this Agreement, the Employer shall have the right, in its sole discretion, to alter or eliminate entirely these benefits currently offered, provided such revisions match those of employees outside the bargaining unit." At paragraph 2, the contract states that the "Company will give notice to the Union of any such changes," and that the "Company's right to alter or eliminate these benefits shall not be subject to article XII—Grievance and Arbitration."

In addition, the contract contains a seniority clause that affects layoffs and recalls. It states inter alia, that "if skill and ability are equal, in the Employer's opinion, then seniority shall prevail. The Employer shall not make decisions on the skill and ability in a capricious or arbitrary manner."

Finally, the contract contains a grievance/arbitration clause at article XII. Coupled with that part of the management rights clause that allows disciplinary actions vis a vis employees based on "just cause," the contract therefore permits an arbitrator in a grievance proceeding to conclude, for example, that the discharge of an employee was not for just cause and therefore that the employee would be entitled to reinstatement and backpay.

It should also be noted that although the Company, pursuant to article XVIII (described above), has the right to alter or modify various benefits during the life of the collective-bargaining agreement, there is a limitation of that right by virtue of the Company's obligation to notify the Union of such changes.

The contract described above expired on May 31, 2014, and no new contract has been negotiated. Although the General Counsel is asserting that certain limited provisions of the contract have been unilaterally changed, the evidence is that for the most part, the terms and conditions of employment as they existed prior to the contract's expiration, have remained in effect.

In August 2012, and subsequently in August 2013, the Company revised its nationwide employee handbook. This was accomplished by posting the changes on its company-wide website that was available to its 40,000 employees. Needless to say, the changes were made available to the 20 employees who

---

[2] The parties stipulated that Mark Appel was neither the president of the company, the chief executive officer, nor a member of the company's executive office. There is however, no doubt that Mr. Appel had authority to execute this contract on behalf of the employer and the Respondent does not contend otherwise. At no time after the contract's execution, has the Respondent asserted that the contract was invalid or inoperative because it was executed by a person without authority.

were covered by the collective-bargaining agreement in Bloomfield, Connecticut. These postings contained language to the effect that employment with the Respondent was on an "at will" basis. As far as I know, there was no discussion between the Union and the Respondent, during the term of the contract, as to what effect, if any, these handbook "at will" provisions would have on the "just cause" provision contained in the collective-bargaining agreement.

On or about January 16, 2014, the Respondent again posted a newly revised handbook covering its employees on a nationwide basis. However, as to its California and Puerto Rico employees, the posting indicated that they would be covered by slightly different provisions. Neither the notices posted on January 16 and 20, nor the handbook itself, state that certain provisions would not apply to employees covered by a collective-bargaining agreement.

This newly revised handbook included the provision that employment was considered to be on an "at will" basis. Further, employees were notified that when new employees were hired, they would be required to sign a statement acknowledging their "at will" status. Neither the handbook nor the notices state that this "at will" status would be applicable only to nonunion employees. On the other hand, there is nothing in the handbook or the notices that states that the Bloomfield employees' contract would not be honored including the grievance/arbitration provisions which permit the Unions to contest whether a discharge or other adverse action was taken without "just cause."

No employee at the Bloomfield facility covered by the collective-bargaining agreement has been required to sign any statement acknowledging that his or her employment is on an "at will" basis.

The General Counsel also contends that prior to the expiration of the contract (May 31, 2014), the Respondent modified the contract by failing to notify the Union regarding a change it made to the employees' paid time-off benefits. In this regard, the alleged change to the collective-bargaining agreement is not the change in the actual time-off benefits, but rather the failure to give notice to the Union before making the change. The General Counsel concedes that pursuant to article XVIII, the Respondent had the right to make the change, provided (a) that the change offered unit employees the same benefit given to employees outside the bargaining unit and (b) that the Company gave notice to the Union of the change. My reading of this provision is that it only requires notice and does not require bargaining about a benefit change.

Under the old policy, effective during the term of the contract, employees were required to provide 1 day of advance notice for 1 day of paid time off; 72 hours of notice for 2 paid days off; and 5 days of notice for 3 or more days of paid time off.

On May 29, 2014, Karpinski notified unit employees that they would be required to provide 2 weeks of notice if they were asking for 4 or more days of paid time off. This change was announced 2 days before the contract's expiration.

Although shop stewards, as unit employees, were aware of the May 29 notice, which they forwarded to the Union, no official notice was given by the Respondent directly to the CWA or to the local Union.

On March 28, 2014, one of the employees filed a decertification petition in 01–RD–012542 seeking an election to determine if a majority of the employees in the unit wished to be represented by the Union. That petition was supported by a showing of interest, which means that at least 30 percent of the bargaining unit employees signed something to indicate that they no longer wished to be represented. The decertification petition has not been dismissed, but its processing has been blocked by this unfair labor practice case.

At some time later, the Respondent received a petition to remove the Union as the representative of the employees. This was signed by a majority of the employees in the bargaining unit.

Notwithstanding the filing of the RD petition and the receipt of the employee petition, the Respondent has not withdrawn recognition from the Union. And in fact, it continued to bargain for a period of time and continues to deal with the Union with respect to various grievances and other matters.

On October 8, 2014, Mark Theodore, the Respondent's attorney sent the following letter to Patrick O'Neil, which in effect, suspended contract negotiations.

> This letter is to inform you that T-Mobile has received from the employees in the Connecticut Area market, objective evidence of a loss of majority support of bargaining unit employees, a majority of whom no longer wish to be represented by the CWA. Under NLRB case law the Company would be privileged to withdraw recognition at any time after the expiration of the parties' agreement.... The collective bargaining agreement expired on May 31, 2014.
>
> The Company always has maintained that an election is the best course of action when it comes to deciding questions concerning union representation and twice has been willing to proceed to such an election in this bargaining unit. As you are aware, employees in the bargaining unit filed a timely certification petition several months ago. Unfortunately, their efforts to seek a simple election have been blocked by the CWA's unfair labor practice charges.
>
> Given the CWA's lack of majority status, the Company is going to suspend bargaining while the question concerning representation is sorted out.
>
> If the election on the employee petition is held, and should the Union prevail, bargaining will resume. In this period of suspension, the Company will abide by the terms of the expired collective bargaining agreement, as well as any other interim bargaining obligations that may arise.

By letter dated October 15 2014, O'Neil wrote to Theodore as follows:

> I have one question about your letter. You state that the Company will abide by the terms of the expired collective bargaining agreement. Does this include the just clause provision of the contract? Is the Company prepared to arbitrate any disputes that arise concerning discipline, despite the suspension of negotiations?

> On October 27 2014, Theodore replied:
>
> In your letter, you asked what suspension of bargaining for a successor contract means. It is simple: T-Mobile will abide by the law just as it always has done. This means that certain provisions of the parties' expired contract will remain unchanged by force of law: other provisions do not survive contract expiration.

Although Theodore might be accused of being a bit coy, it would be clear to any experienced labor relations practitioner that in accordance with present law, an arbitration clause, unlike most other provisions of a collective-bargaining agreement, does not continue after the contract's expiration.

### III. ANALYSIS

Among other things, Section 8(d) provides that when a contract is made, the duty to bargain "shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract" The purpose of this provision, (enacted to modify the decision in *NLRB v. Sands Mfg. Co.*, 306 U.S. 332, 342 (1939)), was to insure a degree of stability once the parties to a collective-bargaining relationship have established a contract for a fixed term. (A bargain made is a bargain to be kept). To allow either party to require the other to bargain about an issue that has been set for a fixed period of time, would, in a sense, make the agreement somewhat illusory and insert a degree of instability into the relationship between the parties. (There is, however, nothing unlawful if both parties to a collective-bargaining agreement voluntarily and mutually agree to a midterm modification).

Pursuant to Section 8(a)(5), the Act also imposes a duty to bargain when an employer chooses to make a change in an existing term and condition of employment where that change is not covered by terms and conditions of a collective-bargaining agreement. This obligation exists during the term of an existing contract and, in most respects, after the contract expires, so long as a union remains the legally recognized bargaining representative. The duty to bargain in such cases involves the obligation to give notice to a union about the desired change and a reasonable opportunity to bargain about the change. However, the duty to bargain attaches only to changes that materially affect terms and conditions of employment.

It is the contention of the General Counsel and the Charging Party that by issuing a new employee handbook in January 2014, the Respondent effectively modified the existing collective-bargaining agreement by telling the bargaining unit employees that they were "at will" employees and that they could, in effect, be terminated with or without just cause.

The Respondent asserts that this claim is incorrect and that a handbook written for and issued to 40,000 employees, was never intended to modify, nor could it legally modify, the terms of the existing collective-bargaining agreement. It notes that there is no evidence to suggest that the Company by any of its agents or representatives, ever directly told, claimed, or suggested to the Union, or to the employees, that the grievance/arbitration or the "just cause" provisions of the contract had been changed, modified or superseded by the handbook provisions. And if the Company had chosen to take that position, there were plenty of opportunities to do so when union representatives met with the Company to discuss a variety of matters after the handbook was issued.

I don't think that the issuance of an employee handbook that included a statement reiterating a long standing company assertion that it considers its employees to be "at will" employees, can reasonably be construed as an attempt to modify the "just cause" provisions of the collective-bargaining agreement, which in this case, covers 20 out of about 40,000 employees. There is no evidence of any communication by the Company to the Union or to the employees, that the revised handbook was somehow meant to nullify any of the terms of the collective-bargaining agreement. In my opinion, this assertion is a creative but incorrect interpretation of a document that was clearly not intended to modify, alter or change the existing contract.

Based on the above, I conclude that by issuing the handbook with the statement about "at will" employment, the Respondent has not violated Sections 8(a)(5) and 8(d) of the Act. I also conclude that the Respondent has not notified employees that bargaining would be futile.

On May 29, 2014, the Company notified the bargaining unit employees that there were some changes in the amount of notice time that would be required if they wanted to take 4 or more days of paid time off. Basically, they were required to give 5 more days of notice than had previously been required. (Two weeks instead of 5 days).

The General Counsel and the Charging Party do not contend that the Company could not make the change in the paid time off policy. Rather, they contend that the Respondent modified the existing contract by failing to give notice of the change.

As described above, the contract allows the Company, in its sole discretion, to change existing benefits, including paid time off, provided that the change is the same as given to nonbargaining unit employees; and provided that it gives notice of the change to the Unions. The contract does not require the Company to maintain the existing benefit until such time as the parties have either reached an impasse or reached an agreement on the change. Indeed, it does not require bargaining at all.

In my opinion, this was a change in a contractual provision and it did occur a couple of days before the contract expired. So technically, this could be considered a modification of the existing contract. Nevertheless, it is also my opinion, that this change, which related only to the contractual notice procedure, was not sufficiently material so as to justify a finding that the Respondent violated the Act. In short, I conclude that this alleged violation was de minimus.

Finally, the complaint alleges that the Respondent has unlawfully suspended negotiations for a contract in violation of Section 8(a)(5) of the Act.

In this regard, the facts show that on October 8, 2014, the Company, by its counsel, wrote a letter to the unions suspending negotiations until such time as an election determined that the union still represented a majority of the unit employees. The Company did not withdraw recognition from the unions and since October 8, it has continued to deal with the unions on

a variety of matters affecting the terms and conditions of the employees, including grievances.

The Respondent's defense is based on the fact that an employee filed a decertification petition and that it also received a petition from more than 50 percent of the unit employees indicating their desire to not be represented by the Unions.

In *Levitz Furniture Company of the Pacific*, 333 NLRB 717 (2001), the Board held that an employer could not legally withdraw recognition from an incumbent union based only on its "good faith" belief that the union no longer represented a majority of the bargaining unit employees. However, the Board did hold that by "demonstrating good-faith reasonable uncertainty (rather than disbelief) as to unions' continuing majority status, an employer could file an RM petition." (Thereby permitting the Board to hold a secret ballot election). The Board also held that an employer could legally withdraw recognition if it could prove by objective evidence that a union had lost its majority support. As to the legality of an employer's withdrawal of recognition, the Board stated:

> [W]e hold that an employer may rebut the continuing presumption of an incumbent union's majority status, and unilaterally withdraw recognition, only on a showing that the union has, in fact, lost the support of a majority of the employees in the bargaining unit. We overrule Celanese and its progeny insofar as they hold that an employer may lawfully withdraw recognition on the basis of a good-faith doubt (uncertainty or disbelief) as to the union's continued majority status.
>
> We have also decided to allow employers to obtain RM elections by demonstrating good-faith reasonable uncertainty (rather than disbelief) as to unions' continuing majority status. We adopt this standard to enable employers who seek to test a union's majority status to use the Board's election procedures—in our view the most reliable measure of union support—rather than the more disruptive process of unilateral withdrawal of recognition.[3]

We emphasize that an employer with objective evidence that the union has lost majority support—for example, a petition signed by a majority of the employees in the bargaining unit—withdraws recognition at its peril. If the union contests the withdrawal of recognition in an unfair labor practice proceeding, the employer will have to prove by a preponderance of the evidence that the union had, in fact, lost majority support at the time the employer withdrew recognition. If it fails to do so, it will not have rebutted the presumption of majority status, and the withdrawal of recognition will violate Section 8(a)(5).

Notwithstanding the presentation of objective evidence showing that a union has, in fact, lost its majority status, an employer's withdrawal of recognition may still be unlawful, if that withdrawal is tainted by other unfair labor practices. But in order to show a "taint" the Board has held that "there must be specific proof of a causal relationship between the unfair labor practice and the ensuing events indicating a loss of support." See *Lexus of Concord, Inc.*, 343 NLRB 851 (2004), and cases cited therein.

In the present case, the employer has presented evidence showing that the unions have lost their majority support. Further, as I have concluded that the Respondent has not engaged in the alleged unfair practices, there is no reason to find that the loss of majority status was caused by those alleged violations.

Based on the above, it would be permissible to conclude that the employer could have completely withdrawn recognition. Nevertheless, it chose not to do so; instead merely suspending contract negotiations until an election could be held to determine majority status or lack thereof. If the employer could have legally withdrawn recognition, then surely it could have taken the lesser path of suspending negotiations on a temporary basis. I therefore conclude that the Respondent has not violated the Act in this respect.

## CONCLUSION

For the reasons stated above, I conclude that the complaint should be dismissed.

Dated, Washington, D.C. August 3, 2015

---

[3] While proof that a union lacks majority support will allow an employer to completely withdraw from its bargaining obligation, evidence showing only doubt as to majority status will only permit an employer to ask the Board to hold an election. In the latter instance, even where an election is scheduled, the employer is still required to negotiate in good faith; albeit any contract made will be deemed to be null and void if the Board thereafter certifies that the union failed to obtain a majority of the valid votes counted. In this case, since a decertification petition had already been filed, there was no need for the Employer to file its own election petition.

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FEB 24 2017

RECEIVED

UNITED STATES COURT OF APPEALS

DISTRICT OF COLUMBIA CIRCUIT

333 Constitution Avenue, NW
Washington, DC 20001-2866
Phone: 202-216-7000 | Facsimile: 202-219-8530

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED　FEB 24 2017

CLERK

Case Caption:　T-MOBILE USA, INC.

　　　　　　　Petitioner

　　　　　　　v.

　　　　　　　NATIONAL LABOR RELATIONS BOARD

　　　　　　　Respondent

Case Number: 17-1065

## CERTIFICATE OF SERVICE

Pursuant to Rule 15(c) of the Federal Rules of Appellate Procedure, I, Mark Theodore, an attorney, hereby certify that on February 24, 2017, I caused a true and complete copy of T-Mobile USA, Inc.'s Petition for Review to be served via First Class Mail on counsel for parties admitted to participate in the proceedings before the National Labor Relations Board, as follows:

Thomas W. Meiklejohn, Esq.
Livingston Adler Pulda Meiklejohn & Kelly PC
557 Prospect Avenue
Hartford, CT 06105-2922

Atul Talwar, Esq
Communication Workers of America
District 1 – Legal Department
350 Seventh Avenue, 18th Floor
New York, NY 10001

Communications Workers of America, AFL-CIO
193 State Street, Suite 2
North Haven, CT 06473-2214

John J. Walsh, Jr.
Regional Director
National Labor Relations Board, Region 1
10 Causeway Street, 6th Floor
Boston, MA 02222-1001

Rick Concepcion
National Labor Relations Board
Counsel for the Acting General Counsel
A.A. Ribicoff Federal Building
450 Main Street
Hartford, CT 06103

Additionally, pursuant to Rule 15(c) of the Federal Rules of Appellate Procedure, I hereby certify that on February 24, 2017, I caused four additional true and complete copies of T-Mobile USA, Inc.'s Petition for Review to be filed with the United States Court of Appeals for the District of Columbia for service by the Clerk on Respondent National Labor Relations Board:

Hon. Gary Shinners Executive Secretary
Office of the Executive Secretary
National Labor Relations Board
1015 Half Street SE
Washington, DC 20570-001

Linda Dreeben
Deputy Associate General Counsel
National Labor Relations Board
1015 Half Street, S.E.
Washington, D.C. 20570

Dated: February 24, 2017

/s/ Mark Theodore
Mark Theodore
Irina Constantin
PROSKAUER ROSE LLP
2049 Century Park East, 32nd Floor
Los Angeles, CA 90067-3206
Telephone:   (310) 557-2900
Facsimile:   (310) 557-2193
mtheodore@proskauer.com
iconstantin@proskauer.com
Attorneys for Petitioner,
T-MOBILE USA, INC.

2